1   MICHAEL C. TU (State Bar No. 186793)
    *mtu@orrick.com*
2   KEVIN M. ASKEW (State Bar No. 238866)
    *kaskew@orrick.com*
3   ELLIOTT S. HENRY (State Bar No. 259381)
    *ehenry@orrick.com*
4   ORRICK, HERRINGTON & SUTCLIFFE LLP
    777 South Figueroa Street, Suite 3200
5   Los Angeles, California 90017-5855
    Telephone:   (213) 629-2020
6   Facsimile:    (213) 612-2499

7   *Attorneys for Plaintiffs Cirrus Education Inc.,*
    *Cirrus (Beijing) Corp., Cirrus Ltd. and iQ-Hub Pte Ltd.*
8

9                  **UNITED STATES DISTRICT COURT**

10               **CENTRAL DISTRICT OF CALIFORNIA**

11                       **WESTERN DIVISION**

12

13

| | |
|---|---|
| 14  CIRRUS EDUCATION INC.,  a corporation; CIRRUS (BEIJING) CORP.; a corporation, CIRRUS LTD.; a corporation; and IQ-HUB PTE LTD., a corporation, | Case No. 2:16-CV-9194 |
| 15 | |
| 16 | **COMPLAINT FOR:** |
| 17             Plaintiffs, | **(1) DEFAMATION,** <br> **(2) INTENTIONAL INTERFERENCE** <br>    **WITH PROSPECTIVE** <br>    **ECONOMIC ADVANTAGE,** |
| 18        v. | **(3) NEGLIGENT INTERFERENCE** <br>    **WITH PROSPECTIVE** <br>    **ECONOMIC ADVANTAGE,** |
| 19  CHRISTOPHER M. ADAMS, an individual; DAVID V. ADAMS, trustee of the Christopher Adams Trust; DVA, INC., a corporation; and MORGAN ADAMS, INC., a corporation, | **(4) VIOLATION OF CALIFORNIA** <br>    **BUS. & PROF. CODE § 17200 ET** <br>    **SEQ.,** |
| 20 | **(5) DECLARATORY RELIEF, AND** |
| 21 | **(6) INJUNCTIVE RELIEF** |
| 22        Defendants. | |
| 23 | **DEMAND FOR JURY TRIAL** |

24

25

26

27

28

1  Plaintiffs CIRRUS EDUCATION INC. ("CEI"), CIRRUS (BEIJING)
2  CORP. ("Cirrus Beijing"), CIRRUS LTD., and iQ-HUB PTE LTD. ("iQ-hub")
3  (collectively "plaintiffs"), allege the following against defendants CHRISTOPHER
4  M. ADAMS ("Christopher Adams" OR "Adams"), DAVID V. ADAMS, DVA,
5  INC. and MORGAN ADAMS, INC. (collectively, "defendants").

6  ## NATURE OF THE ACTION

7    1.    Defendants in this case were the plaintiffs in a California Superior
8  Court case, captioned *Christopher Adams v. David Topolewski*, Los Angeles Sup.
9  Ct. No. BC382058 (filed Dec. 11, 2007) (hereinafter, the "Superior Court Action").
10 In the Superior Court Action, defendants here (plaintiffs there) succeeded in
11 convincing the Superior Court that a long-ago loan of only a few hundred thousand
12 dollars by Christopher Adams entitled him to a windfall $60 million-plus judgment
13 against a now-defunct company called English Xchange Pte Ltd. ("EXPL"), some
14 of its former officers, and "related" entities (collectively, the "Superior Court
15 Defendants").[1]  This windfall judgment was entered following two trials in which
16 the Superior Court Defendants were unable to defend themselves.  The Superior
17 Court Defendants were not given notice of the first trial, and were erroneously
18 precluded from presenting relevant evidence in the second.  The $60 million-plus
19 judgment amount was premised on a one-sided and misleading set of projections
20 presented by Adams.

21    2.    The plaintiffs in this case include Cirrus Education Inc. ("CEI"), an
22 entity which acquired certain intellectual property assets from EXPL in an arms-
23 length transaction after EXPL, a failing enterprise, entered receivership pursuant to
24 Singapore law.   Neither CEI, nor any of the other plaintiffs in this case, were ever
25 named as defendants in the Superior Court Action.  Indeed, plaintiffs in the

26

27 [1] The "Superior Court Defendants" are David Topolewski ("Topolewski"), Victoria
28 (Hong) Mu ("Mu"), EXPL, C-Interchange, Inc., ER Acquisitions, Inc., English
   Xchange, Inc., and Wen He Educational Technology Co. Ltd.

COMPLAINT

Superior Court Action (defendants here) never even tried to amend their complaint to name the plaintiffs here, let alone serve them with process or otherwise give them notice of the proceedings in the Superior Court Action.  Accordingly, plaintiffs here did not appear in the Superior Court Action to represent their interests.  Remarkably, though, the Superior Court amended its judgment to hold the plaintiffs in this case—none of whom appeared in the Superior Court Action— jointly and severally liable for the $60 million-plus judgment as purported "successor entities" to EXPL.

3.     Plaintiffs have specially appeared in the California Court of Appeal to challenge (among other things) the Superior Court's erroneous "successor entity" finding.  Plaintiffs do not seek to raise that issue in this Court.  What plaintiffs seek instead is a declaratory judgment from this Court finding that plaintiffs are not the alter egos of the parties actually named as defendants in the Superior Court Action, including EXPL.  Defendants have explicitly threatened to seek to hold plaintiffs liable for the judgment in the Superior Court Action under an alter ego theory, but that issue has not been litigated or decided in the Superior Court Action.  It is thus a live controversy that is ripe for resolution here.  This proceeding will not be duplicative of any other.

4.     That plaintiffs are not alter egos of the Superior Court Defendants will be demonstrated by clear and overwhelming evidence.  Most notably, there is almost no overlap between the shareholders of plaintiff CEI, on the one hand, and the former shareholders of the now-defunct EXPL, on the other hand.  For example, of CEI's over 50 individual and corporate shareholders, only three were minor shareholders of EXPL.  Those three shareholders held just 1.78% of EXPL's shares, and now hold just 7.23% of CEI's shares.  The nearly 93% of CEI's equity shareholders who have never had any connection to EXPL would be severely and negatively affected by a finding that CEI is an alter ego of EXPL and therefore should be responsible for a $60 million-plus judgment against EXPL and others.

COMPLAINT

5.      This action also seeks redress for recent tortious misconduct by defendant Christopher Adams. Apparently not content with having obtained an unfounded and exorbitant windfall judgment, Adams has recently embarked on an effort to smear and defame plaintiff Cirrus Beijing and interfere with its pending application for listing on the NEEQ stock exchange in China. On November 9, 2016, Adams personally sent a letter to the NEEQ imploring the exchange to deny Cirrus Beijing's listing application. In support of that letter, Adams made a number of demonstrably false and defamatory statements concerning Cirrus Beijing's ownership structure, further described herein, with the intention of interfering with Cirrus Beijing's prospective economic advantage.

6.      Adams' defamatory letter to the NEEQ had the desired effect. It caused the investment bank handling Cirrus Beijing's proposed listing to cease its efforts to pursue the listing. This failure of Cirrus Beijing's listing efforts—proximately caused by Adams' misconduct—will significantly hamper Cirrus Beijing's ongoing efforts to raise capital as a publicly-traded company in China and will hinder its attempts to grow its business to take advantage of highly favorable market conditions. Cirrus Beijing seeks compensatory and punitive damages as well as an injunction to restrain Adams from making further false and/or defamatory statements.

## THE PARTIES

7.      Plaintiff CIRRUS EDUCATION INC. ("CEI") is a Cayman Islands corporation having its principal place of business in Beijing, China.

8.      Plaintiff CIRRUS LTD. is a Hong Kong corporation with its principal place of business in Hong Kong.

9.      Plaintiff CIRRUS (BEIJING) CORP. is a Chinese corporation with its principal place of business in Beijing.

10.      Plaintiff iQ-HUB PTE, LTD. is a Singapore corporation with its principal place of business in Singapore.

11. Defendant CHRISTOPHER M. ADAMS ("Christopher Adams" or "Adams") is an individual residing in the City of Los Angeles, County of Los Angeles, State of California. Adams was a plaintiff in the Superior Court Action.

12. Defendant DAVID V. ADAMS is the trustee of the Christopher Adams Trust, being administered in the County of Los Angeles, State of California for and on behalf of the Trust's beneficiary, defendant Christopher Adams. David V. Adams, as the trustee of the Christopher Adams Trust, was a plaintiff in the Superior Court Action.

13. Defendant DVA, INC., a California corporation, is a corporation which maintains its principal place of business in the County of Los Angeles, State of California. DVA, Inc. was a plaintiff in the Superior Court Action.

14. Defendant MORGAN ADAMS, INC., a California corporation, is a corporation which maintains its principal place of business in the County of Los Angeles, State of California. Morgan Adams, Inc. was a plaintiff in the Superior Court Action.

## JURISDICTION AND VENUE

15. Original jurisdiction over the claims asserted in this matter exists under 28 U.S.C. §1332(a), in that the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States and/or foreign states.

16. This Court has personal jurisdiction over defendants because they are all domiciled and/or have their principal place of business in California.

17. Venue in this judicial district is conferred under 28 U.S.C. §1391(b), (c), as the defendants reside in the Central District of California, and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

18. While jurisdiction and venue are appropriate for purposes of the claims asserted in this case, plaintiffs do not by this action concede or waive any argument

COMPLAINT

1  or defense as it pertains to the issue of whether personal jurisdiction exists, or
2  existed, over them for purposes of the Superior Court Action.  Plaintiffs have made
3  a special appearance in the California Court of Appeal (on appeal from the Superior
4  Court Action) in order to assert their rights in that forum, which include the
5  argument that the Superior Court did not have proper jurisdiction over them in the
6  Superior Court Action.

7  ### **FACTUAL ALLEGATIONS**

8       19.    In 2000, Victoria (Hong) Mu ("Mu") founded C-Interchange, an
9  educational technology company, with the goal of marketing English-language CD-
10  ROM training programs in China.

11       20.    On June 15, 2001, Christopher Adams formed an entity known as ER
12  Acquisitions II Inc.  Adams used that company to advance funds to C-Interchange.
13  These funds were intended to provide C-Interchange with resources for capital
14  expenses, employee salaries, rent and other expenses.  However, Adams regularly
15  failed to make agreed-upon payments.  In addition, in exchange for work to be
16  performed by Adams on behalf of C-Interchange, Adams was to be paid an annual
17  salary, starting at $80,000, if and when he worked.  However, Adams deferred
18  payment of this salary, purportedly in order to avoid draining the limited capital
19  resources of a start-up company.  In any event, Adams did not perform the duties
20  that were expected from him in exchange for his salary.

21       21.    In October 2001, Topolewski formed an entity called English Xchange
22  Pte Ltd. ("EXPL").  At the same time, Topolewski, Mu and Adams formed an
23  entity called English Xchange, Inc. ("EXI"), with Topolewski as CEO, Mu as
24  President, and Adams as Vice President.  Topolewski and Mu later told Adams that
25  he was the owner of 260,000 ordinary shares in EXPL, with two certificates
26  representing 130,000 ordinary shares held in his name by the corporate secretary in
27  Singapore.

28       22.    By 2006, EXPL had received investments from several venture capital

1   investors, amounting to several million dollars in total.  Through the life of EXPL,

2   it ultimately raised approximately $8 million.  Adams played no role in raising any

3   of these funds.

4   **EXPL Enters Receivership**

5   23.   By 2007, EXPL was not in good financial shape.  The company was

6   not adequately funded, was experiencing difficulties in product development, and

7   did not yet have any meaningful revenues (contrary to Adams' claim that the

8   company had many millions in annual revenues).  As a result of these difficulties,

9   combined with the effects of the global economic downturn, EXPL was insolvent.

10   By March 31, 2007, EXPL's liabilities exceeded its assets by $2,374,645, and other

11   EXPL-affiliated entities had liabilities exceeding assets by $2,888,442.

12   24.   By 2009, EXPL began defaulting on loans.  By December 31, 2009,

13   EXPL had liabilities exceeding assets by $9,966,000.  The company was also

14   operating at a loss of over $6.3 million.  Other EXPL-affiliated entities were

15   similarly floundering.  In short, the business at the time was unsuccessful, failing

16   and insolvent.

17   25.   As a result of these financial difficulties, in December 2009 EXPL was

18   in default on its secured loans and the company's secured creditors began to look

19   for a receiver.  On March 19, 2010, EXPL's secured creditors finally obtained the

20   appointment of an independent receiver, pursuant to Singapore law, to handle the

21   undertaking, property and assets of the company.  The independent receiver,

22   Michael Seet, handled the winding down of the business.  Mr. Seet, an experienced

23   Singapore CPA and receiver, had had no previous dealings or involvement with

24   EXPL, Topolewski or Mu.  His appointment was approved by a Singapore court.

25   26.   During the receivership process, EXPL's few remaining assets were

26   foreclosed upon.  Abrax and IWU, two entities which had made multi-million

27   dollar secured loans to the EXPL entities, held rights to intellectual property and

28   notes as security for the loans they had made.  In connection with the receivership

1    proceedings, EXPL's intellectual property was valued by Stone Forest Corporate

2    Advisory, an independent valuation company with no prior connection or

3    relationship with EXPL (or with the plaintiffs in this case).  Following that

4    valuation analysis, EXPL's intellectual property rights were acquired by CEI

5    through the receivership sale process in exchange for CEI agreeing to assume a

6    significant amount of secured debt.

7        27.    The winding-down process was overseen and approved by the

8    independent receiver, Mr. Seet, pursuant to Singapore law.  EXPL's subsidiary

9    entities were similarly wound down, dissolved, or are otherwise no longer in

10    operation.

11        28.    When EXPL collapsed, Adams lost his financial stake in the company.

12    But Adams was far from the only disappointed investor.  Indeed, every EXPL

13    investor lost his or her investment in the company.

14                    **The Plaintiffs and Their Businesses**

15        29.    The plaintiffs in this case, Cirrus Education Inc. ("CEI"), Cirrus

16    (Beijing) Corp. ("Cirrus Beijing"), Cirrus Ltd. and iQ-Hub Pte Ltd. ("iQ-Hub"), are

17    separate and distinct from EXPL and its affiliated entities.

18        30.    CEI, a Cayman Islands corporation, owns companies that provide

19    mobile education software and training in China and other Asian markets,

20    providing electronic English and Mandarin, vocational, and upselling teaching

21    services in the education and hospitality industries.  It conducts research and

22    development, and owns intellectual property relating to the education software

23    business.  CEI has many contracts with a variety of different companies and

24    vendors.

25        31.    CEI has approximately 50 individual and corporate shareholders.  Mu

26    and Topolewski own no shares of CEI.  Furthermore, of CEI's shareholders, only

27    three were shareholders of EXPL.  Those three shareholders held just 1.78% of

28    EXPL's shares, and now hold just 7.23% of CEI's shares.  Nearly 93% of CEI's

COMPLAINT

shareholders have never had any connection to EXPL. There is very little overlap between the shareholders of CEI, on the one hand, and shareholders of EXPL, on the other hand. None of the three shareholders who have previously owned stock in EXPL have any position or role with CEI or its operations beyond their positions as CEI shareholders. None of the companies named as defendants in the Superior Court Action are affiliates or subsidiaries of CEI.

32.     Cirrus Ltd. is a Hong Kong subsidiary that is owned 100% by CEI. It is largely a holding company, but has an app store business as well. It does business primarily in Hong Kong. None of the companies named as defendants in the Superior Court Action are affiliates or subsidiaries of Cirrus Ltd.

33.     Cirrus (Beijing) Corp. is a Chinese operating entity owned approximately 22% by Cirrus Ltd. and approximately 21% by CEI. The remaining shares are owned by Chinese investors, none of whom held any ownership interest in EXPL. None of the companies named as defendants in the Superior Court Action are affiliates or subsidiaries of Cirrus Beijing.

34.     iQ-Hub Pte Ltd. is a Singapore subsidiary of CEI that is owned 100% by CEI. It is an operating entity that operates across Southeast Asia. None of the companies named as defendants in the Superior Court Action are affiliates or subsidiaries of iQ-Hub Pte Ltd.

COMPLAINT

35.    The following chart illustrates the basic corporate structure of CEI and its relevant businesses:



36.    By contrast, the corporate structure of EXPL and its affiliated entities is illustrated in the chart below.   As demonstrated by these charts, there is no corporate connection whatsoever between CEI and EXPL.  As reflected in the chart below, none of the plaintiffs in this case were part of, or have ever been part of, the EXPL corporate structure, whether as parents, subsidiaries or related entities.



COMPLAINT

**First Superior Court Trial**

37.     On December 11, 2007, Adams, the Christopher Adams Trust, DVA, Inc., and Morgan Adams, Inc. filed a lawsuit (as previously defined, the "Superior Court Action") in Los Angeles Superior Court against the Superior Court Defendants (Mu, Topolewski, ER Acquisitions, Inc., C-Interchange, Inc., English Xchange, Inc., EXPL and Wen He Education Technology Co. Ltd.).  Adams and the other plaintiffs in the Superior Court Action sought to recover as economic damages Adams's alleged 19.7% interest in EXPL, the principal and interest on outstanding loans, and Adams' unpaid salary.  The first amended complaint, filed on April 13, 2009, asserted causes of action for fraud, constructive fraud, unjust enrichment, breach of fiduciary duty, and breach of contract.  Plaintiffs in this case were not named as defendants in the Superior Court Action.

38.     C-Interchange, Inc. was dismissed before trial in the Superior Court Action, but the other defendants remained in the lawsuit.  However, shortly before the trial was scheduled to take place, counsel for Mu and Topolewski withdrew from the case and did not represent them at the trial.  Plaintiffs are informed and believe that Mu and Topolewski did not have notice of the trial, and neither they nor any lawyer representing them appeared at that trial.  Despite the absence of Mu, Topolewski, or any counsel representing them from the trial, the Los Angeles Superior Court commenced trial proceedings on August 19, 2010, and the plaintiffs presented an unopposed case.

39.     Without any opposition, the Superior Court perhaps unsurprisingly found in favor of the plaintiffs in the Superior Court Action.  In this unopposed trial, the trial court accepted plaintiffs' unrebutted proffered valuation of EXPL at approximately $318 million – despite the fact that EXPL was insolvent, had laid off its staff, had no assets, was in receivership, had no business operations, and that the total investment by all investors in EXPL was only a few million dollars.  The Superior Court therefore made an erroneous finding that Adams's alleged 19.7%

COMPLAINT

interest was worth approximately $62 million.  As described below, this erroneous finding would be reversed by the California Court of Appeal.

40.     Following the trial and after receiving notice of the unopposed trial judgment, Mu and Topolewski engaged new counsel, and they appealed from the judgment.  Mu and Topolewski argued on appeal that they were deprived of due process because they did not receive notice of the trial, and that the valuation of EXPL was unsupported by the evidence.  The California Court of Appeal determined that the trial court had erred in its determination of the valuation of EXPL, and remanded the case for a new trial on valuation issues.

**Second Superior Court Trial**

41.     Following remand, the parties engaged in discovery and motion practice, and ultimately ended up at a second trial.  The plaintiffs in this case, however, again played no part in the Superior Court Action.  Throughout the entire case and trial, plaintiffs in the Superior Court Action made no attempt to name any of the plaintiffs in this case as defendants in the Superior Court Action.  No amendment was attempted and no notice was given.  No attempt was ever made to serve the plaintiffs in this case with notice of the Superior Court Action or any of the proceedings therein.

42.     At a discovery hearing held before Judge Rosenblatt in the Superior Court Action on February 9, 2016, plaintiffs in the Superior Court Action informed the court that, if they were successful in obtaining a judgment against the Superior Court Defendants, they intended to enforce that judgment against CEI.  The Superior Court judge rightly questioned how the plaintiffs in the Superior Court Action intended to do so, given that CEI was not a defendant in that case:

Court:      So, under your plan, your theory, Mr. Baker, what does a judgment look like?

Mr. Baker:  It looks like a money judgment.

Court:      Against?

- 11 -

COMPLAINT

| | | |
|---|---|---|
| 1 | Mr. Baker: | Against the entities. |
| 2 | Court: | What entities? |
| 3 | Mr. Baker: | Cirrus Education Ltd. |
| 4 | Court: | Not a defendant. |
| 5 | Mr. Baker: | I will put on evidence of alter ego and ask you for a judgment against Cirrus Ltd. and Qooco and Hong Mu and Topolewski in the sum of "x" number of dollars that we will put before you at the time. And we will provide you with a judgment and ask you to sign it. |
| 8 | Court: | Okay. So I – so you should brief it. Brief the legal mechanism. |
| 10 | Mr. Baker: | Okay. |

This exchange between Adams' counsel and the Superior Court demonstrates that defendants intended from the beginning to seek a judgment against the plaintiffs, yet intentionally did not inform plaintiffs of the claims so that plaintiffs would not oppose them. Despite Judge Rosenblatt's order that they brief the issue of how a judgment could be enforced against CEI, plaintiffs in the Superior Court Action (defendants in this case) made the tactical decision never to file any briefing with respect to how the plaintiffs in this case could or should be liable as alter egos.

43.  Following the February 9, 2016 hearing, Judge Rosenblatt retired, and the Superior Court Action was transferred to Judge Sotelo for further proceedings, including trial. Defendants neglected to provide the written briefing on the alter ego issue (as ordered by Judge Rosenblatt), apparently in the hope that the newly assigned judge would not identify the issue. And because none of the plaintiffs here were participants in or had any involvement with the Superior Court Action, they were unable to raise the issue again with the court.

44.  The Superior Court Defendants were subsequently precluded from presenting any affirmative evidence as to the relationship between the plaintiffs and the defendants, because of evidentiary sanctions that were ordered against the

COMPLAINT

1    Superior Court Defendants at trial.  These sanctions were ordered after the

2    individual defendants in the Superior Court Action were unable to produce

3    corporate documents and information relating to the plaintiffs in this case (who

4    were not parties in the Superior Court Action).  The Superior Court ordered these

5    issue sanctions notwithstanding the facts that: (a) two separate Chinese law firms

6    opined that handing over these corporate documents could subject Topolewski and

7    Mu (who both reside and work in China) to civil and even criminal penalties within

8    China; and (b) plaintiffs in the Superior Court Action never sought to serve the

9    plaintiffs in this case with discovery.

10        45.    As a result of the evidentiary sanctions, the Superior Court did not

11   consider any evidence at trial regarding the lack of any connection between the

12   Superior Court Defendants and plaintiffs, and did not allow Mu and Topolewski to

13   present any such evidence.

14        46.    After a one-sided trial in which the Superior Court Defendants were

15   precluded from presenting key evidence, the Superior Court entered a judgment of

16   over $60 million.  In addition, the Superior Court made a finding that the plaintiffs

17   in this case—who were not parties to the Superior Court Action, were not given

18   notice of the Superior Court Action and thus were unable to appear and defend

19   themselves—were "related entities" and "successor entities" to some of the

20   Superior Court Defendants and that they should be jointly and severally liable for

21   the judgment.

22        47.    The Superior Court Defendants filed a motion for a new trial and a

23   motion to vacate the judgment.  After the Superior Court denied those motions by

24   the Superior Court Defendants, and before plaintiffs had the opportunity to file their

25   own motion to vacate, the Superior Court Defendants filed a notice of appeal,

26   divesting the Superior Court of further jurisdiction over the matter.  The plaintiffs

27   subsequently, and separately, have made a special appearance in the California

28   Court of Appeal to appeal the judgment as aggrieved non-parties.  That appeal is

COMPLAINT

1    currently pending.

2    48.    There are a number of bases for appealing the Superior Court's ruling

3    against the plaintiffs in this action (who were non-parties in the Superior Court

4    Action).  For example, the Superior Court's application of the successor liability

5    doctrine is unprecedented and unsupported by the law.  Further, the Superior Court

6    accepted the wholly speculative valuation of an entirely different entity proffered

7    by the plaintiffs in the Superior Court Action, ultimately awarding them an

8    unjustified windfall judgment.

9    49.    An actual controversy has arisen and now exists between the parties

10   relating to whether the plaintiffs are the alter egos of the Superior Court Defendants

11   and therefore may be liable on such a theory—an issue that was not presented or

12   decided in the Superior Court Action.  Plaintiffs desire a declaration establishing

13   that they are not alter egos of the Superior Court Defendants.  Without such a

14   declaration, defendants could potentially attempt to enforce their $60,000,000-plus

15   judgment against plaintiffs on an alter ego basis.

16   **Misconduct by Christopher Adams**

17   50.    Apparently not content with having parlayed an outlay of a few

18   hundred thousand dollars into a $60 million-plus judgment, Christopher Adams has

19   recently embarked on an effort to smear and defame Cirrus Beijing and interfere

20   with its business prospects, as described below.

21   51.    Cirrus Beijing has an outstanding application for listing on the NEEQ

22   (the National Equities Exchange and Quotations), an over-the-counter Chinese

23   stock exchange which provides a greater depth of financing for Chinese small-to-

24   medium enterprises like Cirrus Beijing.  The NEEQ is regulated by the China

25   Securities Regulatory Commission.

26   52.    If Cirrus Beijing's application for listing on the NEEQ were to be

27   approved, the company's financial and growth prospects would be significantly

28   enhanced.  A public company listing would facilitate the company's efforts to raise

capital in support of its current efforts to expand in order to take advantage of favorable market conditions.

53.   On November 9, 2016, Adams sent a letter to the NEEQ's Surveillance Department of Exchange, for the expressly stated purpose of "urg[ing] the NEEQ to inspect the evidence I provide and suspend the processing of [Cirrus Beijing's] application [for NEEQ listing]."  A copy of this letter is attached as Exhibit A to this complaint, and is incorporated by reference.  Unfortunately, much of the purported "evidence" provided in Adams' letter was false and libelous.

54.   Adams' letter to NEEQ contains patently false statements regarding the ownership and control of Cirrus Beijing.  Adams represented in his letter that "[t]he share interest diagram of all parties is shown in Appendix II." *Id*.  In Appendix II, Adams included the following purported organizational chart, which he titled "Share Interest Diagram (as confirmed by two judgments in the Superior Court of California)": [2]



---

[2] This image is presented exactly as it appears in Adams' letter, including the cut-off words in the boxes.

COMPLAINT

55.    This chart is entirely inaccurate.  The relationships it purports to depict were not, as Adams contends, "confirmed" in the Superior Court Action or in any other action.  To the contrary, nothing in the record in the Superior Court Action provides support for the relationships depicted in the chart, let alone in the two judgments that were issued in the Superior Court Action.  Most strikingly, Cirrus Beijing is not owned 100% by "English Exchange HK" [sic], and Cirrus Beijing has never been owned, in whole or in part, by English Xchange HK.  As described above, Cirrus Beijing is a Chinese operating entity owned approximately 22% by Cirrus Ltd. and approximately 21% by CEI.  The remaining shares in Cirrus Beijing are owned by Chinese investors, not by English Exchange HK.   There is no corporate or ownership connection between Cirrus Beijing and English Xchange HK.

56.    Similarly, Adams' letter to NEEQ falsely claims that "[t]he parent company of [Cirrus Beijing] is English Exchange Pte. Ltd. ("EXPL")."  As explained above, this is false.  EXPL is not the "parent company" of Cirrus Beijing, and never was.  Cirrus Beijing is owned entirely by different shareholders, with no ownership whatsoever by EXPL.

57.    Adams concluded his letter to NEEQ by "request[ing] the Surveillance Department of Exchange of the NEEQ to review the provided evidence and make an appropriate decision with regards to Cirrus' application for listing on the NEQQ [sic], including but not limited suspending the review of, and rejecting, Cirrus' listing."

58.    The false and libelous statements in Adams' letter to NEEQ have proximately caused significant harm to Cirrus Beijing.  Upon review of the false and libelous statements in Adams' letter, the primary investment bank leading the listing for Cirrus Beijing informed the company that it would no longer be pursuing the listing, in view of the allegations made in Adams' letter.

59.    The failure of Cirrus Beijing's listing application, which is a direct

1   result of Adams' false and libelous letter, will force Cirrus Beijing to significantly

2   scale back its planned business growth and operational plans.  Cirrus Beijing had

3   been planning to take advantage of a public listing by raising significant capital to

4   ramp up with thousands of partners in the coming year.  Adams' interference with

5   the listing will at a minimum cause significant delay to the company's fundraising

6   and growth plans, if not altogether preventing those plans from coming to fruition.

7                                    **LIVE CONTROVERSY**

8           60.     There exists a live controversy in this case because Cirrus Beijing has

9   been injured as a result of the false and libelous statements made by Adams, as

10   described above and as further alleged below.  In addition, with respect to

11   plaintiffs' claim for declaratory relief, defendants have previously identified their

12   intent to pursue alter ego claims against plaintiffs, informing the Superior Court

13   that they intended to "put on evidence of alter ego and ask [the court] for a

14   judgment against Cirrus Ltd."  This is not an issue that has ever been presented,

15   litigated or determined in the Superior Court Action.  Given defendants' prior

16   statement in open court indicating their intent to pursue alter ego claims against

17   plaintiffs, there exists a real and reasonable apprehension that defendants will seek

18   to impose liability on the plaintiffs by claiming they are alter egos of the Superior

19   Court Defendants.

20                                **FIRST CAUSE OF ACTION**

21                                       **Defamation**

22                    **By Plaintiff Cirrus Beijing Against Defendant Adams**

23          61.     Plaintiffs hereby allege and incorporate by reference paragraphs 1

24   through 60, inclusive, of this Complaint, as though fully set forth herein.

25          62.     On or about November 9, 2016, Adams made at least the following

26   defamatory statements about Cirrus Beijing in a letter sent to the NEEQ:

27                    a.  Adams falsely indicated in Appendix II to the letter that Cirrus

28                        Beijing is owned 100% by English Exchange HK.

1                b.  Adams falsely stated that "[t]he parent company of [Cirrus Beijing]

2                    is English Exchange Pte. Ltd. ("EXPL")."

3       63.     These statements were entirely false.

4       64.     Adams' defamatory representations had the actual effect of interfering

5 with Cirrus Beijing's application for listing on the NEEQ by deterring the

6 investment bank handling the listing application from further association with

7 Cirrus Beijing.

8       65.     At a minimum, Adams failed to use reasonable care to determine the

9 truth or falsity of these statements.  Indeed, Adams knew that these statements were

10 false.

11      66.     These statements identified above were defamatory and libelous on

12 their face, and Cirrus Beijing therefore need not establish that it suffered special

13 damages as a result of the defamation.  But in the alternative, Cirrus Beijing plainly

14 suffered damages as a proximate result of Adams' defamatory statements, namely,

15 that the failure of Cirrus Beijing's listing application (as a result of Adams' letter)

16 will force the company to significantly scale back its growth plans.

17      67.     Adams acted with reckless, willful or callous disregard for Cirrus

18 Beijing's rights and with malice, fraud or oppression toward it, thereby entitling

19 Cirrus Beijing to an award of punitive damages in accordance with proof at trial.

20                         **SECOND CAUSE OF ACTION**

21           **Intentional Interference With Prospective Economic Advantage**

22              **By Plaintiff Cirrus Beijing Against Defendant Adams**

23       68.     Plaintiffs hereby allege and incorporate by reference paragraphs 1

24 through 67, inclusive, of this Complaint, as though fully set forth herein.

25       69.     Cirrus Beijing had an economic relationship with NEEQ that would

26 have resulted in economic benefit to Cirrus Beijing.

27       70.     Adams knew of this relationship, as evidenced by the fact that he sent

28 a letter to NEEQ with the stated intention of severing the relationship.

71.     Adams expressly and admittedly intended to interfere with the relationship between Cirrus Beijing and NEEQ.

72.     Adams engaged in wrongful conduct to disrupt the relationship between Cirrus Beijing and NEEQ.  As alleged above and incorporated here by reference, Adams made false and defamatory statements in a letter sent to NEEQ.

73.     As a direct and proximate result of Adams' conduct, Cirrus Beijing's relationship with NEEQ has been disrupted.  As a direct and proximate result of Adams' conduct, Cirrus Beijing has been harmed in that its listing prospects are now uncertain and its growth plans forced to be scaled back.  Cirrus Beijing has been and will continue to be damaged in an amount to be proven at trial.

74.     Adams acted with reckless, willful or callous disregard for Cirrus Beijing's rights and with malice, fraud or oppression toward it, thereby entitling Cirrus Beijing to an award of punitive damages in accordance with proof at trial.

## THIRD CAUSE OF ACTION

### Negligent Interference With Prospective Economic Advantage

### By Plaintiff Cirrus Beijing Against Defendant Adams

75.     Plaintiffs hereby allege and incorporate by reference paragraphs 1 through 74, inclusive, of this Complaint, as though fully set forth herein.

76.     Cirrus Beijing had an economic relationship with NEEQ that would have resulted in economic benefit to Cirrus Beijing.

77.     Adams knew or should have known of this relationship, as evidenced by the fact that he sent a letter to NEEQ with the stated intention of severing the relationship.

78.     Adams knew or should have known that if he did not act with due care, his actions would interfere with Cirrus Beijing's relationship with NEEQ and cause Cirrus Beijing to lose in whole or in part the probable future economic benefit of the relationship.  Adams failed to act with reasonable care when he made false and defamatory statements in a letter sent to NEEQ.

COMPLAINT

79.     Adams engaged in wrongful conduct to disrupt the relationship between Cirrus Beijing and NEEQ.  As alleged above and incorporated here by reference, Adams made false and defamatory statements in a letter sent to NEEQ.

80.     As a direct and proximate result of Adams' conduct, Cirrus Beijing's relationship with NEEQ has been disrupted.  As a direct and proximate result of Adams' conduct, Cirrus Beijing has been harmed in that its listing prospects are now uncertain and its growth plans forced to be scaled back.  Cirrus Beijing has been and will continue to be damaged in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

## Violation Of California Business & Professions Code § 17200, et seq.

### By Plaintiff Cirrus Beijing Against Defendant Adams

81.     Plaintiffs hereby allege and incorporate by reference paragraphs 1 through 80, inclusive, of this Complaint, as though fully set forth herein.

82.     Adams has engaged in unfair competition by virtue of making false and defamatory statements in a letter sent to NEEQ with the intent of interfering with Cirrus Beijing's listing application.

83.     As a direct and proximate result of Adams' unfair competition, Cirrus Beijing has been harmed in that its listing prospects are now uncertain and its growth plans forced to be scaled back.

84.     Unless restrained, Adams will continue in the acts and conduct set forth above to Cirrus Beijing's great and irreparable injury, for which damages will not afford adequate relief.  Cirrus Beijing is entitled to an injunction to restrain Adams from continuing to make false and/or defamatory statements.

## FIFTH CAUSE OF ACTION

### Declaratory Relief

### By All Plaintiffs Against All Defendants

85.     Plaintiffs hereby allege and incorporate by reference paragraphs 1 through 84, inclusive, of this Complaint, as though fully set forth herein.

COMPLAINT

86.   The plaintiffs seek a declaratory judgment establishing that the plaintiffs, on the one hand, and the Superior Court Defendants, on the other hand, are not alter egos with respect to any potential claims by the defendants.

87.   The plaintiffs are separate and distinct from EXPL, and are not alter egos of that entity or any of the Superior Court Defendants.

88.   The requirements for establishing alter ego liability under California law are well-established.  In order to hold a company liable for a judgment as an alter ego, despite that company not having appeared in the lawsuit to defend itself, a party must show "(1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice." *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.,* 328 F.3d 1122, 1134-35 (9th Cir. 2003).  In addition, in order to address due process concerns, an alleged alter ego must have "controlled the defense of the litigation." *NEC Elecs. Inc. v. Hurt*, 208 Cal. App. 3d 772, 781, 256 Cal. Rptr. 441, 446 (1989).

89.   There are a number of considerations for determining whether there is a unity of interest and ownership.  These include, for example, "inadequate capitalization, commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, use of one as a mere conduit for the affairs of the other, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers." *VirtualMagic Asia, Inc. v. Fil-Cartoons, Inc.*, 99 Cal. App. 4th 228, 245 (2002).  The evidence in this case will demonstrate that these factors do not exist, and therefore that the Court should determine that the plaintiffs are not the alter egos of the Superior Court Defendants.

90.   First, there is no evidence of inadequate capitalization, and in fact the evidence will establish the opposite.  EXPL was not inadequately capitalized.  To

the contrary, EXPL had received millions of dollars in investments and loans over its years in existence.  It was not through any withdrawal of funds from the company that it eventually failed, but a number of other factors, including global and regional economic conditions, failures by Adams to raise capital, and the unfavorable timing of the offering of the language service, among other business-related reasons.  This was recognized by several of the investors in EXPL.

91.     The evidence will also demonstrate that there was no commingling of any funds between the plaintiffs and the Superior Court Defendants.  EXPL's assets were never commingled with those of the plaintiffs.  Any of EXPL's assets that were ultimately owned by the plaintiffs were acquired through a formal receivership process that was conducted during the wind-down of the company by an independent receiver working pursuant to Singapore law.

92.     The plaintiffs have never held themselves out as liable for the debts of EXPL.

93.     The evidence will also establish that the ownership of EXPL compared to the ownership structure of the plaintiffs is nearly completely different in composition.  It is improper to treat the plaintiffs as if they are effectively the same as EXPL where the investments and ownership in the two companies are almost completely distinct.  Of CEI's over 50 individual and corporate shareholders, only three were also shareholders of EXPL.

94.     As illustrated in the following chart, those shareholders held just 1.78% of EXPL's shares:

COMPLAINT

1
2
3
4
5
6
7
8
9
10



11    95.    Similarly, just 7.23% of CEI's shares are held by former EXPL

12  shareholders.  Thus, <u>92.77%</u> of the ownership of CEI is completely unique from the

13  ownership of EXPL.

14
15
16
17
18
19
20
21
22
23



24  The starkly different ownership of the respective entities highlights that these are in

25  fact different entities, and could not be deemed to be alter egos of each other.

26    96.    EXPL regularly conducted itself in accordance with the law, and

27  maintained records for all corporate activities.  When EXPL had to wind down, that

28

1    receivership process was handled by an independent receiver, and then liquidator.

2    The assets of EXPL were valued by an independent consultant.  The entire process

3    was well-documented, and notice was provided to all interested parties that the

4    company was winding down through proxy statements or otherwise.  In the process,

5    all investors lost out – not just Adams.  In fact, some investors admitted that they

6    "lost a lot of money" when EXPL was dissolved, but that they understood that that

7    was a risk with their investment.  They reviewed the valuations of the company and

8    acknowledged that the company simply could no longer operate.  The plaintiffs also

9    maintain corporate records as required by law.

10         97.    The plaintiffs are not alter egos of EXPL, and no inequitable result

11   would follow a refusal to disregard the corporate identities of the plaintiffs.  The

12   plaintiffs in the Superior Court Action, for example, have prevailed against the

13   Superior Court Defendants following their trial.  They can pursue a money

14   judgment against those individuals and entities, subject to that claim being affirmed

15   by California's appellate courts.  Further, Adams has not demonstrated he has

16   invested any amount into the EXPL entities.  There is no meaningful loss to him.

17         98.    On the contrary, an inequitable result will follow if the plaintiffs are

18   found to be alter egos of the Superior Court Defendants.  Because over 90% of the

19   shares of the plaintiffs in this case are owned by individuals who had no interest in

20   EXPL, the great majority of the shareholders will suffer a loss based on no

21   wrongdoing on their part at all.  There would be no equity in forcing a loss on these

22   innocent bystanders, who would all lose investment money.

23         99.    Finally, the plaintiffs did not control the litigation in the Superior

24   Court Action.  In fact, the plaintiffs had no part or involvement in the litigation.

25   Control of litigation is also based on a number of factors, including whether the

26   alter egos financed the litigation, hired the attorneys, and controlled the course of

27   the litigation.  The plaintiffs never financed the litigation of the Superior Court

28   Action.  Nor did the plaintiffs hire the attorneys representing the defendants in that

COMPLAINT

1   case.  They did not control the litigation either.  There was no mention of the

2   lawsuit in any corporate meetings, even with respect to Topolewski and Mu

3   individually.

4        100.   The plaintiffs are not alter egos of the Superior Court Defendants.  The

5   overwhelming weight of all of the considerations for a finding of alter ego strongly

6   favors such a conclusion.  The plaintiffs are therefore entitled to a judgment

7   declaring that fact.

8        101.   Further, it is well-established that the law would not permit any court

9   to engage in "reverse piercing" of the corporate veil to find the plaintiffs to be alter

10   egos of Mu and Topolewski.  Only by a so-called "reverse piercing" of the

11   corporate veil can a corporation be found liable for the debts of its shareholders

12   held by a third party.  But the "reverse piercing" doctrine has been soundly rejected

13   in California.  *See United States v. One Hundred Thirty-Three 133 United States*

14   *Postal Serv. Money Orders Totaling $127,479.24*, 496 F. App'x 723, 725 (9th Cir.

15   2012).

16   *///*

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

a)      That Cirrus Beijing be awarded actual, compensatory, and restitution damages in an amount to be determined at trial;

b)      That Cirrus Beijing be awarded exemplary and/or punitive damages;

c)      That Adams be enjoined from making further false and/or defamatory statements;

d)      That the Court issue a declaratory judgment in favor of plaintiffs, declaring that plaintiffs are not the alter egos of the Superior Court Defendants;

e)      That plaintiffs be awarded their costs, expenses and attorney fees incurred herein; and

f)      For such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury on all causes of action so triable.

Dated: December 12, 2016          ORRICK, HERRINGTON & SUTCLIFFE LLP

By:_____/s/ Michael C. Tu_____
          Michael C. Tu

Attorneys for Plaintiffs Cirrus Education Inc., Cirrus (Beijing) Corp., Cirrus Ltd. and iQ-Hub PTE Ltd.

COMPLAINT